(No. 21639.— ▮▮▮▮▮▮▮▮▮)
THE SUPER-POWER COMPANY OF ILLINOIS, Appellant, *vs.*
WILBERT C. SOMMERS *et al.* Appellees.

*Opinion filed June 16, 1933.*

STEVENS & HERNDON, JESSE BLACK, Jr., and H. C. FRINGS, for appellant.

RALPH DEMPSEY, and J. M. POWERS, for appellees.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

On October 6, 1931, appellant, the Super-Power Company of Illinois, presented to the county judge of Tazewell county its petition for the condemnation of sites for four supporting towers on, and an easement over, a strip of land 250 feet in width, running diagonally across a farm in that county, for the erection, operation and maintenance of an electric transmission line being constructed by appellant from Powerton, on the Illinois river near Pekin, Illinois, to Chicago, pursuant to an order of the Illinois Commerce Commission authorizing appellant to construct the transmission line and to acquire the right of way therefor, exercising the power of eminent domain, if necessary. Wilbert C. Sommers and Edna Sommers, the owners of the farm, and T. N. Smith, trustee in a trust deed to the farm, were made parties defendant to the petition and are appellees in this court. On the day fixed for hearing on the petition, Wilbert C. and Edna Sommers filed a cross-petition, alleging that they were the owners of the farm, containing approximately 158 acres, of which the land sought to be taken and over which the easement was sought was a part; that the farm was operated as a unit; that the construction of the transmission line across the farm would greatly damage and reduce the market value of the whole farm, and praying compensation for the damage so caused. Before the introduction of any evidence the jury viewed the premises. The trial resulted in a verdict finding just compensation for the land taken to be $28.12, and for the damage to the land in the strip over which the

easement was to extend, and which was not taken, to be $2533.02. After appellant's motion for a new trial had been overruled judgment was entered authorizing appellant to enter upon and use the land described in its petition for the purposes mentioned, upon payment, within thirty days, of the full compensation fixed by the jury. This is an appeal from that judgment.

The farm across which the transmission line is to be constructed is a quarter section of land, with small tracts of approximately one acre each out of the northeast and southeast corners thereof. It is located about four miles southeast of the court house in Pekin. It is bounded on the north by a State hard-surfaced road and on the east by a gravel road. The farm is well improved and the soil is good. The dwelling house and other buildings thereon are located near the center of the north 80 acres. The strip of land over which the transmission line is to be erected and over which the easement is to extend is 250 feet in width and 2835 feet in length and contains 16.26 acres. The middle line of the strip begins at a point 368.38 feet north of the southwest corner of the farm and crosses the farm in a northeasterly direction, north 68 degrees and 32 minutes east, to a point a few feet north of the center of the east line of the farm. The transmission line is to carry electric energy at 220,000 volts. The transmitting agencies are to be six conductors, or transmitting cables, suspended three each from two rows of towers. There are to be four towers erected on the farm in question. The first pair of towers is to be 853 feet from the west boundary of the strip, and the second pair is to be 1025 feet from the first pair and 954 feet from the east boundary of the strip. The individual towers are to be set with their sides parallel to and at right angles to the line of the right of way, but as pairs they are set with their centers in a north and south line. The center of each tower will be 75 feet from the side of the easement strip. The towers are to be constructed of

the highest-grade bridge steel, with a leg at each of the four corners and diagonal and horizontal steel supports from leg to leg. Each leg is set in a foundation of re-inforced concrete, consisting of a base nine inches thick and four feet in diameter, set eight feet below the surface of the ground, and a shaft 10⅝ inches in diameter, which has an incline, the same as the legs of the towers, of 1.36 inches to the foot. The area of land occupied by each tower, when measured at the base of the foundations, will be 35 feet and 21.32 inches square, or .0282 of an acre, and at the level of the ground will be 29 feet five inches square, or .01986 of an acre. The total area occupied by the four towers, measured at the base of the foundations, will be .1128 of an acre, and measured at the surface of the ground will be .0794 of an acre. At a height of 81 feet above the surface of the ground each of the towers will support a cross-arm extending a distance of 33 feet four inches on each side of the center of the tower. From these cross-arms will be suspended insulators, at the bottoms of which will be attached the conductors, or transmitting cables, at a height of over 71 feet above the ground. Allowing for sag between towers the cables will never be lower than 31 feet from the surface of the ground. The conductors or transmitting cables will be made up of fifty-four strands of one-eighth-inch aluminum wire woven around a cable of seven strands of one-eighth-inch steel wire. The distance from the outside transmitting cable of one tower to the outside transmitting cable of the other of a pair of towers is 166⅔ feet, and a distance of 41⅔ feet from the outside transmitting cable to the edge of the right of way is required to allow for possible swing of the cables from quiet position. On each tower, at a height of eight feet above the cross-arm from which the transmitting cables will be suspended will be another cross-arm supporting two shield or protection cables made of aluminum and steel and about six-tenths of an inch in diameter. In constructing the transmission line across the

farm all material will be brought onto the strip through gates to be placed by appellant in all fences prior to beginning the construction work, and after the construction work has been completed the gates will be left as built or will be removed and the fences restored, at the option of the owners of the farm. The foundations for the legs of the towers are cast off of the farm, and they, and all other materials used in the construction work, will be brought onto the strip by truck or caterpillar wagon. After the construction work is completed all surplus material and debris will be removed. The strip will not be fenced, and all uses of the strip not inconsistent with the construction, operation and maintenance of the transmission line will remain in the owners of the farm. The line will be so constructed that should a transmitting cable break, the flow of current through it will cease immediately through the operation of circuit-breakers. The line will be inspected and patrolled by men on foot, who will cross the strip not oftener than once each week.

Thirteen witnesses for appellant testified as to the fair cash market value of the land in the easement strip and as to the amount of damage to the land in the strip over which the easement was to extend. Four of these witnesses valued the land at $150 an acre, one at $155 an acre, two at $160 an acre, one at $162 an acre, one at $170 an acre, two at $175 an acre, one at $180 an acre, and one at $210 an acre. Fourteen witnesses for appellees testified as to the value of the land in the strip and as to damages to the land therein not to be occupied by towers. One of these witnesses valued the land at $200 an acre, eight at $225 an acre, one at $230 an acre, and four (one of whom was Wilbert C. Sommers, who was one of the owners of the land,) at $250 an acre. The verdict and judgment fixed the compensation to be paid for the .1128 acres of land to be taken—that is, occupied by towers—at $28.12, which is at the rate of $249.29 an acre. The award for land to be taken is therefore greatly in excess of the value thereof as testified to by any of

appellant's witnesses, and is from $19.29 to $49.29 an acre higher than the values testified to by ten of the fourteen witnesses for appellees.

The thirteen witnesses for appellant who testified as to value of the land and damages thereto, testified to damage to the land in the strip not occupied by towers ranging from $25 to $55 an acre. One of these witnesses fixed the damages at $25 an acre, two at $30 an acre, one at $35 an acre, one at $37.50 an acre, two at $40 an acre, one at $48.75 an acre, four at $50 an acre, and one at $55 an acre. The fourteen witnesses for appellees above referred to, testified to damages to land in the easement strip not occupied by towers of from $150 to $200 an acre. One of these witnesses fixed the damages at $150 an acre, one at $165 an acre, three at $168.75 an acre, one at $170 an acre, three at $180 an acre, one at $185 an acre, one (Wilbert C. Sommers) at $187.50 an acre, one at $190 an acre, one at $194 an acre, and one at $200 an acre. The verdict and judgment fixed the compensation for damages to the land in the easement strip not occupied by towers at $2533.02, or $156.85 for each of the 16.15 acres in the strip not actually to be taken. There was no testimony of damage to any of the land of the farm that is outside the strip.

Appellant called as a witness Marshall Harris, who testified in substance as follows: He was a graduate of the agricultural department of the University of Kentucky. Under his direction the University of Illinois had conducted an extensive investigation concerning farming operations in fields which were crossed by electric power transmission lines supported by steel towers. The investigation included actual measurements of the area around towers on which no crop was raised because of the inconvenience in conducting farming operations around such towers and the measurement of additional time required in conducting farming operations around such towers for every kind of crop raised in central Illinois. The investigation covered opera-

tions on more than seventy-five farms in central Illinois. This investigation disclosed that the greatest loss of area and time was in case the land was planted in corn. The results of the investigation made by him showed that the actual uncultivated area around each of the towers to be placed on the farm in question, where the crop was corn, would be a little less than one-twenty-seventh of an acre, and the loss of time by man throughout the entire crop season, including the preparation of the ground and the harvesting of the corn, would be 72 minutes for each tower. If horses were used in the farming operations the loss of time would be 225 minutes for one horse, assuming that the number of horses used would be the number usually used by farmers in central Illinois in such farming operations. There would also be a loss of 72 minutes in the use of farming implements. If a tractor was used in making the corn crop, in the operations where a tractor may be used, the loss of time throughout the crop season where the crop was corn would be 68 minutes by man, 72 minutes by horse, 32 minutes by tractor and 68 minutes by implements for each tower. The loss of area and time in case the crop was wheat or oats would be less than where the crop was corn.

Other witnesses for appellant who had had actual experience in conducting farming operations on farms across which were constructed transmission lines on steel towers, described the methods of conducting farming operations around such towers and told of the loss of time and area on account of the presence of such towers. The testimony of these witnesses corroborated the testimony given by the witness Harris as to the loss of area and time that will be occasioned by the presence of the towers to be erected on the farm in question. It is shown by the evidence that the average price of corn for a five-year period preceding the date of the filing of the petition in this case in Tazewell county was seventy-six cents a bushel; that the average yield of corn on the farm in question was about sixty bushel

to the acre; that the prevailing rates of pay in the neighborhood where the farm in question is located were twenty-five cents an hour for a man, twelve and a half cents an hour for a horse and $1.15 an hour for a tractor.

Of the thirteen witnesses for appellant who testified as to land value and damages to the land in the easement strip not to be occupied by towers, five were farmers who had had actual experience in conducting farming operations on land on which were erected towers supporting transmission lines. One of these five witnesses fixed the damages to the land in the easement strip not occupied by towers at $25 an acre, one at $30 an acre, one at $37.55 an acre, one at $40 an acre, and one at $50 an acre.

Appellee Wilbert C. Sommers testified that he had lived on the farm in question more than twenty years; that he had never planted trees or erected buildings on any part of the easement strip and at the time appellant's petition was filed had no intention of putting trees or buildings on the strip but that he had intended farming the strip just as he had in the past. He fixed the damages to the land in the easement strip not occupied by towers at $187.50 an acre and stated that he did not like to give an easement across his land, and in arriving at the amount of damages per acre he allowed at least half of the amount for the mere fact that appellant would have the right to patrol the strip and to enter upon it for the erection and maintenance of the transmission line separated from the actual exercise of the right by appellant.

Practically all of the witnesses for appellees who testified as to damages to the land in the strip not to be occupied by towers stated that in addition to the damage because of the exercise of the right to enter upon the land to construct and maintain the transmission line, and the inconvenience, loss of time and area in farming around the towers, they considered as an element of damage the restriction upon erecting buildings and planting trees on the strip.

The part of the strip over which the transmission line is to be constructed, except the part occupied by the towers, is land not taken. (*Illinois Telegraph News Co.* v. *Meine,* 242 Ill. 568; *Illinois Power and Light Corp.* v. *Peterson,* 322 id. 342.) The measure of the damage to the land in the strip not to be occupied by towers is the depreciation in the cash market value of the strip for agricultural purposes caused by its subjection to appellant's superior right to use it for the erection and maintenance of the transmission line. (*St. Louis and Cairo Railroad Co.* v. *Postal Telegraph Co.* 173 Ill. 508; *Illinois Power and Light Corp.* v. *Peterson, supra.*) In fixing values on property in condemnation cases it is improper to consider its availability for future uses unless such availability is more than a future possibility and is a present capacity for a use which may be anticipated with reasonable certainty and made the basis of an intelligent estimate of value. (*Illinois Power and Light Corp.* v. *Parks,* 322 Ill. 313; *Forest Preserve District* v. *Kean,* 298 id. 37.) Opinions of witnesses as to damages to land can be of benefit to the jury only when such opinions are based on evidence of lawful elements of damage. (*Illinois Power and Light Corp.* v. *Peterson, supra.*) Damage to be compensated for must be direct and proximate and not such as is merely possible or may be conceived by the imagination. *Illinois Power and Light Corp.* v. *Talbott,* 321 Ill. 538.

From an inspection of this record we are convinced that the jury gave practically no consideration to the testimony of the witnesses for appellant, although there was nothing that tended in anywise to discredit them. The compensation awarded for land taken is greater than the value of the land as fixed by most of the witnesses for appellees. The damages to the land in the strip not taken is fixed at about sixty-three per cent of the value of the land as found by the jury in fixing compensation for land taken. From the testimony of appellee Wilbert C. Sommers it appeared that it was not

anticipated that the land in the strip might be used for building purposes or the planting of trees, and yet the witnesses for appellees considered the fact that it could not be used for such purposes after the transmission line was erected, as an element entering into their estimate of damages to the land in the strip. In most, if not all, condemnation cases the testimony of witnesses as to values and damages takes a wide range, but a jury in such case is not warranted in ignoring the evidence produced by either side and the compensation awarded for damage to land must be based on proper elements of damage. *Southern Illinois and Kentucky Railroad Co.* v. *Johnson,* 321 Ill. 187.

One of the instructions given for the appellees is as follows:

"You are further instructed that if you believe, from the entire testimony, and from your inspection of the premises, that any witness has minimized or reduced the value of the land taken or the damages to the remainder of the land in the strip, on account of his interest in the suit, or his prejudice, or want of knowledge or experience or truthfulness, then you have the right and it is your duty, to disregard the testimony of such witness, in so far as you believe the same is unjustly minimized or reduced, either as to the value of the land taken or the damages to the remainder of the land in the strip."

It was error to give this instruction to the jury. The instruction is bad in authorizing the jury to disregard the testimony of witnesses and also because it applies only to witnesses who testified on one side of the case. *Herrin and Southern Railroad Co.* v. *Nolte,* 243 Ill. 594; *Chicago, Ottawa and Peoria Railway Co.* v. *Rausch,* 245 id. 477.

The judgment of the county court is reversed and the cause is remanded.

*Reversed and remanded.*