(Nos. 2824 to 2831,—Inclusive, consolidated;

CHICAGO TITLE & TRUST COMPANY, Nos. 2824, 2825, 2827, 2831, BARNEY S. RADCLIFFE, No. 2826, HARRY D. CALLAHAN, No. 2828, HARRY Z. MUNN AND ANNA MUNN, No. 2829 AND EDWARD F. KOLAR AND JOSEPHINE KOLAR, No. 2830, Claimants, vs. STATE OF ILLINOIS, Respondent.

*Opinion filed March 13, 1940.*

MARKMAN, DONOVAN & SULLIVAN and FRANK S. RIGHEIMER, for claimants.

JOHN E. CASSIDY, Attorney General; GLENN A. TREVOR, Assistant Attorney General, for respondent.

MR. JUSTICE YANTIS delivered the opinion of the court:

The eight above entitled claims were filed prior to the passage of Senate Bill 526 in 1939, amending the Court of

Claims Act relative to claims for damage to real estate. After the passage of said Act amended claims were filed so as to bring the determination of said claims within the provisions of said Act. The Chicago Title & Trust Company as Trustee is claimant in four cases, and separate individuals are claimants in the other four. As the same cause of purported damage is involved in each case and the same Counsel represent all claimants, the cases have been consolidated by agreement of the parties.

Each of the claims is for damages alleged to have resulted to lots belonging to the several claimants from construction of a grade separation by the State of Illinois, of highways adjacent to said properties.

The lots involved are Nos. 1, 2, 3, 44, 45, 46, 47 and 48 in Block 12, and Lots 2, 3, 4, 5, 6 and 7 in Block 13, all in H. M. Connell Company Cumberland Subdivision in the City of Des-Plaines in Cook County, Illinois.

There are no buildings in either of the two blocks. There are three twenty-foot pavements separating various lots which give the appearance of street frontage, but which were platted as alleys. The closest business community is about a mile from the property. There is a filling station within sight, southeast of these lots at the corner of Broadway and Northwest Highway, and the Benjamin Electric Company is located about two blocks east of the oil station.

The Northwest Highway runs northwest and southeast along said property on the south. South of such highway is the right-of-way of the Chicago & Northwestern Railway. An abandoned and closed railroad station previously known as the Cumberland Station lies directly south of the lots in Block 12. This station was boarded up in March, 1937. Certain trains still stop for passengers and a bus line runs along the Northwest Highway. Two highways, i. e. Wolf Road and Golf Road, also known as State Route No. 58 join at the railroad and continue in a northeasterly direction between Blocks 12 and 13 of said Addition, and is now designated in that Block as Wolf-Golf Road. State Road adjoins Block 12 on the north and Broadway adjoins Block 13 on the east.

Prior to the construction of the grade separation, Lots 1, 47 and 48 in Block 12 and Lots 1, 2, 3 and 4 in Block 13 all had a frontage on what was then Wolf Road. It appears from the testimony of William Wallace, State Engineer, that

A plat of the several properties is herewith shown:

Wolf Road had never been developed or improved as a street from the intersection of State Road and Broadway to the railroad right-of-way, prior to the construction of the grade separation. The testimony shows there was quite a hill commencing at a point thirty feet southeast of the Northwest right-of-way line, and that there was a slope from Lot 47 in Block 12 toward Lot 4 in Block 13. This hill sloped to the northeast so that at Station 972 of the Engineer's Plat at the extreme north end of all these properties, the old grade line was fairly level.

The testimony of the Engineer, Mr. Wallace, shows that prior to the building of the viaduct neither Wolf Road, Golf Road nor the combined Wolf-Golf Road was ever paved northward across the Northwestern Railroad along the street between Blocks 12 and 13. Neither was the street open in a southwesterly direction across the Northwestern Railroad on a grade with the railroad. Mr. Wallace was employed in securing the right-of-way for Wolf-Golf Road as now constituted south of the Northwestern Railroad. Such right-of-way was never used for a grade crossing, but was secured so as to connect Route 58 and Wolf Road from a point south of the railroad with Route 58 and Wolf Road north of the railroad by a subway to be constructed underneath the railroad and underneath the Northwest Highway.

Prior to the construction of this subway travel across the railroad was at a point approximately one thousand feet southeast of where the subway was later built, at a grade crossing on Seegers Road. The latter road connected with Golf Road and Wolf Road several hundred feet west of the railroad and connected with Broadway east of the railroad. A person who desired to drive from any of the lots for which damages are sought to a point across and beyond the Northwestern tracks, prior to the construction of this subway, must have proceeded northeasterly from the lots to Broadway, thence southeasterly on Broadway and on Seegers Road across the Northwestern Railroad, and thence to Route 58. Since the construction of the subway Seegers Road has been closed at the railroad right-of-way and traffic now uses the subway in question. There was some excavation work done along the Wolf-Golf Road in 1928-1929 prior to securing the right-of-way south of the Northwestern Railroad. The pavement which now extends along Wolf-Golf Road between

Blocks 12 and 13 of the Cornell Subdivision is a forty-foot pavement, one side of which lies close to the retaining wall that was erected along the frontage of Lots 47, 48 and 1 in Block 12. The right-of-way at that point is one hundred twenty (120) feet.

The right-of-way of Northwest Highway which runs along the southerly side of Lots 4, 5, 6 and 7 in Block 13 and of Lots 44, 45, 46 and 47 of Block 12 is also a forty-foot pavement, the right-of-way being eighty-three (83) feet. There is a sidewalk on the northern side of Northwest Highway adjacent to the lots abutting thereon, and there is a sidewalk on the northwest side of Wolf-Golf Road between the top of the retaining wall and Lots 47, 48 and 1 in Block 12. The top of the retaining wall follows approximately the ground line or elevation of those lots. There is also a sidewalk on the southerly side of State Road adjacent to Lots 1, 2 and 3 in Block 12. There is a concrete handrail about three feet high on top of the retaining wall and a stairway for pedestrians on the north side of Northwest Highway near the corner of Lot 47, which goes from the lot level down to a sidewalk on the lower level of the subway, thence under the Northwest Highway and the tracks.

At the time of the construction of the subway the only part of the paving of the Northwest Highway which was torn out, was that which was involved in the grade separation and which was replaced across Route 58. The change in elevation of the Northwest Highway, if any, was less than one foot, the change there being a widening job of such Northwest Highway. Pedestrians now going from any of the lots in question would have access from their properties along the sidewalk and the stairway in question to the stairway, and thence across to any desired point beyond the Chicago & Northwestern Railroad.

Claimants predicate their claim to damages on averment of the legal principle, that, "Any Change in the Grade of a Street or Highway by Which Egress or Ingress to Private Property is Obstructed Amounts to Damages to Private Property Within the Meaning of Section 13 of Article 2 of the Constitution of 1870," and that "The Measure of such Damages to Abutting Property Caused by a Change in the Grade of a Highway is the Difference Between the Fair Cash Market Value of the Property Prior to the Construction of the Im-

provement and Unaffected by it, and its Fair Cash Market Value After the Construction of the Improvement as Affected by it.''

Respondent takes no issue with the two foregoing provisions of law, but contends that the damage which is recoverable by an owner of private property resulting from the construction of a public improvement, must not be such as is fanciful, speculative, imaginative or conjectural.

The testimony of claimants' witnesses as to the amount of damage incurred is also attacked by respondent, the latter contending that opinions as to damages must be based on lawful elements of damages, and that testimony as to the amount of damages, where the witnesses are shown to have taken into account improper elements in forming their opinions, should be disregarded.

The two principal witnesses called by claimants were G. W. Kunstman and Grover C. Elmore, both of Chicago. Mr. Kunstman has been a real estate appraiser for thirty-six years for municipalities, corporations, banks and individuals, and has been a witness in a number of grade separation cases in and about Chicago. While he testified to a detailed knowledge of the commercial and residential use to which the several lots were best adopted, his testimony disclosed some confusion of mind as to the conditions of the street upon which the lots fronted as such conditions existed prior to the construction of the viaduct. In his testimony he stated that Wolf Road which lies between Blocks 12 and 13 was being used by vehicle traffic prior to the building of the viaduct. That Wolf Road was opened across the railroad with a grade road and extended south of this property all the way to the southern limits of Cook County; that it crossed the Chicago & Northwestern Railroad with a grade crossing and had an old asphalt pavement. These elements were taken into account by him in fixing his valuation of the property prior to the construction of the improvement. Later in his testimony he recalled that Wolf Road was not open across the railroad tracks prior to the building of the viaduct in 1933, and the witness could not then recall for sure whether old Wolf Road was paved between Blocks 12 and 13, as previously stated by him. He was however certain that prior to the improvement the street was all connected up with the Northwest Highway. At another point in his testimony Mr. Kunstman states that

in fixing his valuation of the property as it existed prior to the construction work he based his conclusions on the consideration that Wolf Road would be extended as a grade crossing; that if the plans called for a grade separation, his valuation of Lots 1, 2 and 3 in Block 12 before the improvement would have been $8,000.00, instead of $11,500.00. It becomes apparent that Mr. Kunstman's valuation of the lots before the improvement was premised not entirely on the conditions as they then existed but upon a surmise as to what might in the future take place in the surrounding community. Mr. Kunstman also testified that the best use for Lots 4, 5, 6 and 7 in Block 13 was commercial before the improvement and was still commercial after the improvement, but that such commercial use was limited and restricted by the construction of the viaduct because the Northwest Highway grade had been raised three and one-half (3½) feet. From his testimony it appears that the witness drew many of his assumptions as to the Highway plans from a 1933 highway map showing proposed road construction. The three to four foot change in grade of the Northwest Highway, he stated, decreased the commercial value of Lots 4, 5, 6 and 7 in Block 13 and Lots 45, 46 and 47 in Block 12. In determining his prior valuation for Lot 48 in Block 12, Mr. Kunstman testified (Tr. p. 84), "The important thing I took into consideration in arriving at a valuation of this property was that this Wolf Road was direct access to the Northwestern Railroad; not only vehicles, but pedestrians on their way to the Station would have to pass this property." The value of the several lots have been reduced, according to his testimony, by changing the properties from commercial to residential, due to various factors as testified to by him.

Mr. Grover C. Elmore of Chicago also testified for plaintiffs and stated he had been a real estate broker for twenty-nine years. In 1916 he sold a three hundred (300) acre subdivision west of DesPlaines, and in 1932 or 1933 at the request of the owners, he looked over the properties involved herein with a view to testifying as to their values. There is some confusion apparent in his testimony as to the time at which he determined his opinion of value of the properties before the construction of the improvement and after the construction of the improvement. He also testified that there was a dirt road grade crossing of Wolf Road across the

Chicago & Northwestern tracks in 1933, and that he based his opinion of pre-construction valuation of these properties upon that fact; that he also took into account as one of the elements of decreased valuation of the several properties a change of three to three and one-half feet in the elevation of the Northwest Highway; that such change in grade would influence the values twenty-five (25) per cent. Mr. Elmore also stated he formed his conclusion of pre-construction and after-construction values all in 1933 after the work began. He was asked (Tr. p. 149)—(Q) "Now then the lower figure (after-construction value) when did you form your opinion as to what that would be worth after the work was completed?" He replied, (A) "Well, that was, I took into consideration at the time I made my appraisal, the difference of what the grade separation made between your two pieces of property, and it is very easy to do it all at one time." On the same page appears the previous answer of the witness that his opinion as to pre-construction-value was formed in 1933 shortly *after* the construction work had started.

We again emphasize at this point that the rule as to measure of damages, is the difference in the fair cash market value of the property prior to the construction of the improvement and unaffected by it, and its fair cash market value after the construction of the improvement and as affected by it.

Mr. Elmore further testified that in 1933 he and those with whom he conferred in regard to valuations did not have in mind an immediate demand for the use of these lots, but took into consideration the potential value, and the general trend of building; further, that there was no immediate prospect of any demand for building in 1933.

Mr. H. M. Cornell testified to having laid out the subdivision of the lots in question. Mr. Cornell is a real estate dealer residing in Park Ridge, Illinois with twenty-five years' experience in the business. The lots in question that have been sold since the subdivision, were sold in 1928 shortly after the subdivision of the property. To use his words (Tr. 113), "It was a sort of a stock proposition—a group of people organized a syndicate on a unit basis, and after they subdivided the property they sold a part of the lots and some of the lots are still owned by the syndicate." Mr. Cornell testified that there was no paved road along what is now

designated as Wolf-Golf Road prior to the construction of the subway under the Northwest Highway and the Northwestern Railroad tracks. The paving of the subway was completed in 1936. Mr. Cornell further testified that prior to the time they laid out the Cumberland Subdivision it was possible to cross the Northwestern tracks onto Wolf Road, but that in 1930 the State made an excavation in the territory known as Wolf-Golf Road to use for film in fixing fifty feet of Golf Road east of the circle, i. e. east of these properties, which made it impossible to use Golf Road *if it was usable before;* that since 1930 Wolf-Golf Road was not used until after the subway construction.

Mr. B. F. Eidamiller of DesPlaines, a real estate dealer for fifteen years in that vicinity, was called as a witness by respondent. His testimony shows an intimate knowledge of local conditions and of the physical surroundings of these properties.

Mr. Donald T. Morrison of Chicago, testified to being a member of various real estate boards and engaged in the real estate business for twenty years, during which time he has made subdivisions of various tracts in and near DesPlaines. His evidence discloses a detailed study of conditions and of the facts pertaining to the properties in question. In his testimony we find that Wolf-Golf Road, prior to the construction of the subway was a dedicated street lying between Blocks 12 and 13, but was not used by traffic; that it was grown up in weeds and that as it approached the Northwest Highway at the south end of these properties, the street sloped up to the highway some five or six feet, so that no matter what had happened to Wolf Road they either had to grade it up or grade it down in order to cross the Northwest Highway and the Chicago and Northwestern Railway.

There is much evidence in the record by the various witnesses as to the best use to which these various lots were adapted prior to and after the improvement of Wolf-Golf Road; also as to the grouping of various lots together for sale purposes and their accessibility in such case from other streets. The following chart shows the amount claimed as damages in the several cases, and the opinion of the several witnesses as to value and damage of the respective lots in question:

## DAMAGES CLAIMED.

| Name | Lot | Block | Original Complaint | Amended Complaint |
|------|-----|-------|--------------------|--------------------|
| Chicago Title & Trust Co., etc. (2824) | 1 2 3 | 12 | $3,500.00 | $3,500.00 |
| Chicago Title & Trust Co., etc. (2825) | 4 5 6 7 | 13 | 8,500.00 | 7,500.00 |
| Barney S. Radcliffe (2826) | 47 46 | 12 | 7,000.00 | 8,000.00 |
| Chicago Title & Trust Co. (2827) | 48 | 12 | 3,500.00 | 4,000.00 |
| Harry D. Callahan (2828) | 45 | 12 | 1,500.00 | 1,500.00 |
| Harry Z. Munn & Anna Munn, wife (2829) | 44 | 12 | 1,000.00 | 1,000.00 |
| Edward F. Kolar & Josephine Kolar (2830) | 3 | 13 | 3,000.00 | 2,500.00 |
| Chicago Title & Trust Co. (2831) | 2 | 13 | 3,000.00 | 2,500.00 |

CLAIMANTS' EVIDENCE.

| Name | Lot | Block | (Kunstman) | | | (Elmore) | | |
|------|-----|-------|--------|-------|--------|--------|-------|--------|
| | | | Before | After | Damage | Before | After | Damage |
| Chicago Title & Trust Co. etc. (2824) | 1 2 3 | 12 | $11,500 | $8,000 | $3,500 | $11,850 | $8,000 | $3,850 |
| Chicago Title & Trust Co. etc. (2825) | 4 5 6 7 | 13 | 15,000 | 7,500 | 7,500 | 14,750 | 7,250 | 7,500 |
| Barney S. Radcliffe (2826) | 47 46 | 12 | 14,000 | 6,000 | 8,000 | 12,000 | 6,000 | 6,000 |
| Chicago Title & Trust Co. etc. (2827) | 48 | 12 | 6,000 | 2,000 | 4,000 | 6,000 | 2,000 | 4,000 |
| Harry D. Callahan (2828) | 45 | 12 | 3,000 | 1,500 | 1,500 | 3,000 | 1,500 | 1,500 |
| Harry Z. Munn & Anna Munn, wife (2829) | 44 | 12 | 2,500 | 1,500 | 1,000 | 2,500 | 1,500 | 1,000 |
| Edward F. Kolar & Josephine Kolar (2830) | 3 | 13 | 5,000 | 2,500 | 2,500 | 5,250 | 3,000 | 2,250 |
| Chicago Title & Trust Co. (2831) | 2 | 13 | 5,000 | 2,500 | 2,500 | 5,000 | 2,900 | 2,100 |

RESPONDENT'S EVIDENCE.

| Name | Lot | Block | (Eidamiller) | | | (Morrison) | | |
|------|-----|-------|--------|-------|--------|--------|-------|--------|
| | | | Before | After | Damage | Before | After | Damage |
| Chicago Title & Trust Co. etc. (2824) | 1 | | $2,000.00 | $1,250.00 | $ 750.00 | $2,500.00 | $2,000.00 | $500.00 |
| | 2 | 12 | 1,000.00 | 750.00 | 250.00 | 1,300.00 | 1,170.00 | 130.00 |
| | 3 | | 1,000.00 | 750.00 | 250.00 | 1,300.00 | 1,170.00 | 130.00 |
| Chicago Title & Trust Co. etc. (2825) | 4 | | 1,264.80 | 474.30 | 790.50 | 2,520.00 | 1,890.00 | 630.00 |
| | 5 | 13 | 1,000.00 | 375.00 | 625.00 | 2,520.00 | 1,890.00 | 630.00 |
| | 6 | | 1,000.00 | 750.00 | 250.00 | 1,450.00 | 1,305.00 | 145.00 |
| | 7 | | 1,000.00 | 750.00 | 250.00 | 1,400.00 | 1,260.00 | 140.00 |
| Barney S. Radcliffe (2826) | 46 | | 1,000.00 | 375.00 | 625.00 | 1,800.00 | 1,350.00 | 450.00 |
| | 47 | 12 | 1,509.20 | 565.95 | 943.25 | 1,800.00 | 1,350.00 | 450.00 |
| Chicago Title & Trust Co. etc. (2827) | 48 | 12 | 2,400.00 | 400.00 | 2,000.00 | 2,560.00 | 1,920.00 | 640.00 |
| Harry D. Callahan (2828) | 45 | 12 | 1,000.00 | 750.00 | 250.00 | 1,500.00 | 1,350.00 | 150.00 |
| Harry Z. Munn & Anna Munn, wife (2829) | 44 | 12 | 1,000.00 | 750.00 | 250.00 | 1,500.00 | 1,350.00 | 150.00 |
| Edward F. Kolar & Josephine Kolar (2830) | 3 | 13 | 2,000.00 | 1,250.00 | 750.00 | 2,200.00 | 1,650.00 | 550.00 |
| Chicago Title & Trust Co. (2831) | 2 | 13 | 2,000.00 | 1,500.00 | 500.00 | 2,200.00 | 1,760.00 | 440.00 |

An inspection of the attached plat discloses that Lots 2 and 3 and 44, 45 and 46 in Block 12, and Lots 5, 6 and 7 in Block 13 never had any frontage on Wolf Road or Golf Road, and have not lost any direct ingress or egress rights by reason of the construction of the subway. The damage to those lots is only indirect by virtue of their use with other property.

The members of the Court of Claims have on two occasions inspected the properties and surroundings involved herein, in order to better understand the evidence of the wit-

nesses as it appears in the record, and to gain at first hand a view of the premises in question.

The construction by the State of Illinois of this forty-foot pavement and subway has changed what was previously a dead-end street, untraveled and grown up in weeds, to a modern arterial highway. The loss of ingress and egress to the lots in question appears negligible, except to Lot 48 in Block 12 which has no direct street outlet. However, it, like several others, has access to paved roadways within the subdivision, and from there can now travel over the new pavement of Wolf-Golf Road to all points south.

Witnesses for claimants were apparently mistaken in believing that the grade of Northwest Highway was raised three or four feet in the course of this improvement as the evidence shows there was a change of less than one foot in such grade. In-so-far as this element affected the witnesses' judgment, same is disregarded.

From all the evidence and the conclusions reached from our inspection we must conclude that certain elements were taken into account by the witnesses Kunstman and Elmore in arriving at their opinions of damages which are not supported by the evidence.

The law in this case is plain. In the case of *C. & E. I. Ry. Co.* vs. *Loeb*, 118 Ill. 203, the court said:

"Before adoption of the Constitution of 1870 where there was land taken for public use there was provision for compensation. But where there was other disconnected land not touched by the improvement, but merely damaged, as apparent in this case, no compensation was provided. To meet this want, the clause of the Constitution restrictive of the exercise of the power of eminent domain, provides that private property shall not be taken or damaged for public use without just compensation."

The question as to the right of a property-owner for damages to property damaged but not taken as the result of a public improvement, was thoroughly considered by this court in the consolidated cases of *Albert J. Moore, et al.*, vs. *State*, 8 C. C. R. 686, and the proper elements of damages were there considered.

The law is well settled as to the damages recoverable in cases where private property is damaged but not taken. In the case of *Department of Public Works* vs. *Caldwell*, 301 Ill. 42 and in the case of *Department of Public Works* vs. *McBridge*, 338 Ill. 347, and in numerous other cases, our Supreme Court has held that the true measure of damages for

land not taken is the difference between the fair cash value of the property unaffected by the improvement and its fair cash market value as affected by it. This court has applied the rule thus stated in the case of *Grassle* vs. *State of Illinois,* 8 C. C. R. 150 and in the combined cases of *Sadie Stern, et al.* vs. *State of Illinois,* 8 C. C. R. 251-265.

Opinions as to damages must be based on lawful elements of damage. *Super Power* vs. *Sommers,* 352 Ill. 610 (618).

The damage which is recoverable by an owner of property resulting from the construction of a public improvement must not be such as is fanciful, speculative, imaginative or conjectural.

Upon consideration of all the evidence in the record the court finds: That the fair cash market value of claimant's property has been depreciated as the result of the construction of the subway in question in the following amounts:

| Claimant | No. of Case | Amount |
|---|---|---|
| Chicago Title & Trust Co., etc. (Lots 1, 2, 3 in Block 12) | 2824 | $1,250.00 |
| Chicago Title & Trust Co., etc. (Lots 4, 5, 6, 7, Block 13) | 2825 | 1,915.50 |
| Barney S. Radcliffe (Lots 46 & 47, Block 12) | 2826 | 1,568.25 |
| Chicago Title & Trust Co., etc. (Lot 48, Block 12) | 2827 | 2,000.00 |
| Harry D. Callahan (Lot 45, Block 12) | 2828 | 250.00 |
| Harry Z. Munn & Anna Munn, wife (Lot 44, Block 12) | 2829 | 250.00 |
| Edward F. Kolar & Josephine Kolar (Lot 3, Block 13) | 2830 | 750.00 |
| Chicago Title & Trust Co., etc. (Lot 2, Block 13) | 2831 | 500.00 |

An award is therefore hereby entered in favor of the respective claimants in the several consolidated cases as follows:

| Claimant | No. of Case | Amount |
|---|---|---|
| Chicago Title & Trust Co., etc. (Lots 1, 2, 3 in Block 12) | 2824 | $1,250.00 |
| Chicago Title & Trust Co., etc. (Lots 4, 5, 6, 7, Block 13) | 2825 | 1,915.50 |
| Barney S. Radcliffe (Lots 47 & 46, Block 12) | 2826 | 1,568.25 |
| Chicago Title & Trust Co., etc. (Lot 48, Block 12) | 2827 | 2,000.00 |
| Harry D. Callahan (Lot 45, Block 12) | 2828 | 250.00 |
| Harry Z. Munn & Anna Munn, wife (Lot 44, Block 12) | 2829 | 250.00 |
| Edward F. Kolar & Josephine Kolar (Lot 3, Block 13) | 2830 | 750.00 |
| Chicago Title & Trust Co., etc. (Lot 2, Block 13) | 2831 | 500.00 |

It is further ordered that if a sufficient amount of money is available from funds heretofore appropriated by the Legislature for the payment of such awards and the costs of these proceedings, over and above any and all amounts heretofore ordered paid therefrom, the Director of Public Works and Buildings is in such case directed to issue vouchers in payment of the respective awards hereinabove made and costs as taxed and certified by the Clerk herein, and shall deliver the same to the Director of Finance, and the latter is hereby in such case directed to approve such vouchers and to certify the same to the Auditor of Public Accounts of the State of Illinois, and the latter in such case is directed to issue a warrant or warrants in accordance with such vouchers against the appropriation made for that purpose, and said Auditor shall thereupon deliver said warrants to the Treasurer of the State of Illinois, who is in such case directed to counter-sign and pay such warrant or warrants, all as provided by Section 7 of "An Act in Relation to Compensation For Private Property Damaged For Public Use By the Department of Public Works and Buildings in the Construction or Improvement of Public Highways, approved July 11, 1939." (Ill. Rev. Statutes, 1939, Ch. 47, Par. 24.)

Unless a petition for rehearing is filed within 30 days from this 13th day of March, A. D. 1940, this order shall be and become final upon the expiration of the said period of 30 days.